May it please the Court, my name is Jonathan Rosen, and I represent Plano Fapellant, Sueños LLC. This is a simple case where, as a matter of law, Diane Goldman breached a real estate purchase contract. But the simplicity was destroyed by numerous improper defenses and further at trial when the trier court three things. One, failed to rule as a matter of law that Goldman's second contract offer after her breach constituted undue risk to Sueños and it erred by giving incomplete mitigation instructions for undue risk that precluded Sueños from arguing at closing that Sueños' counteroffer to that second contract offer was not unreasonable. Two, abused its discretion by failing to use Sueños' proposed damages instruction that actual damages was $580,000 or failed to set fair market value in the jury instruction that it did use to the May 2012 resale of the $580,000 by allowing irrelevant and prejudicial evidence that went against its inlimity rulings and tainted the jury's verdict, especially in the nonbifurcated trial. Now, I want to concentrate and focus the Court's attention on two of the major issues here. The first one is the undue risk element of mitigation. The what? I'm sorry, Your Honor. First issue is what? The undue risk element of mitigation under Section 350. This Court, the standard review for this Court is de novo review, and we're asking for a finding that the second contract offer that Diane Goldman proposed to Sueños was, it was constituted undue risk to Sueños as a matter of law. And this is for two reasons. The first one, it had two provisions. The first provision that it had in it that constituted undue risk was the Section 8J supersession clause. Basically, the clause itself says this contract shall supersede all prior agreements. The second one is the Section 6 due diligence period. It would have given, if Sueños would have accepted the second contract offer, it would have given Diane Goldman an opportunity to cure what she didn't do the first time, which was give a contractually acceptable reason to cancel. With these two terms, Sueños, who is the injured party, would lose all of its rights to Goldman's breach, and then Ms. Goldman would be able to give a contractually acceptable reason to cancel. The case law is very staid and very clear that a non-breaching party should never be required to mitigate its damages, mitigate its losses, by accepting an agreement with the breaching party conditioned upon the surrender of its rights under the breached contract. And that's exactly what the second contract offer would have done. And a curious point the Court made in denying Sueños' motion for a new trial, they said they denied it partially because they said the second contract offer was not a standalone document. But we believe it was because the second contract offer was given on August 11th of 2008. We responded to it the next day, but that offer as given, as given, constituted undue risk to Sueños as a matter of law. And that kind of dovetails into my next the next part of my argument, which involves. Yes, Your Honor. This is one where it goes so far out of the usual sell-a-house case that you see, and you wonder how it got there. Why is it that you just said that they couldn't negotiate further, that any further negotiation your client would lose? Is that the point, that he had to give up rights with any further negotiation? Well, we're talking about negotiation after her breach? Is that what you're making reference to, Your Honor? Yes. Okay. When she made that second contract offer, she conditioned Sueños, the superstition clause, conditioned Sueños would lose its rights to the first contract breach. So if Ms. Goldman then, under the new due diligence period, decided to cancel for a contractually acceptable reason, Sueños not only lost its rights to the first contract offer, but then Ms. Goldman would have an opportunity to cure what she didn't do right the first time, which was give contractually permissible reason to cancel. Were there due diligence elements in the counteroffer? Yes, there was, Your Honor, in section 6. How long was her due diligence time? The original contract was 10 days. Ms. Goldman testified at trial that as a matter of – as a show of good faith, she dropped it to 3. But it doesn't matter if it was What did the contract say was her due diligence time? The contract – the second contract offer was 3 days. Three days. Yes. And it doesn't matter if it was – our position is it doesn't matter if it was 3 days or 30 seconds. If Ms. Goldman would have had a second opportunity at the Apple, she could have bid it properly. So that's the problem. That's why the court needed to make a directive finding. Now, what happened after that second contract offer, that can be subject to mitigation, how Sueños responded and counteroffers on the property after that. But as relates to that second contract offer, the trial court erred, as a matter of law, by not finding it undue risk. Because no reasonable juror couldn't find that particular document itself not to be an undue risk. Well, what about Goldman's argument that she offered to close on the deal without a further due diligence period, but at that point your client had raised the price for $20,000 and she didn't want to pay the other $20,000? Understood, Your Honor. Well, the first thing, by breaching the first contract, there was actually a provision that allowed Sueños $25,000 as part of that, because of that breach. That could have been the remedy that Sueños could have chosen. But when you talk about what Ms. Goldman ---- I missed that. What provision gives them $25,000 as a penalty? It was the earnest money provision, Your Honor. Well, that's still part of the price. I mean, it's not a mana from heaven. No, I understand that, Your Honor. Let me make sure I understand your question. When she made the second contract offer and she offered to close, the problem was, is that she didn't do ---- when she gave those provisions that had the supercession clause, that had the due diligence period, when Sueños responded to that counteroffer, she never came back with another offer saying, hey, you know what, I'm not going to pay you $1.55, I'm going to pay you $1.53. She never got there. And under Arizona law, the statute of frauds requires all real estate contracts to be in writing. So that's part of one of the evidentiary issues in this case, and also the fact that the trial court didn't even give an instruction regarding that real estate contracts should be in writing, because she's saying, oh, I verbally accepted the second ---- the counteroffer, except for the price. But couldn't it potentially be relevant for mitigation? That is, if your client knew that, okay, we could do the deal on the original terms, but now I want another $20,000, that suggests that maybe your client has hoped for a continuing increase in the market price, which unfortunately didn't occur, and hoped to squeeze a little more money out, made an election at that point, could either do the original deal or ask for more, and it decided to ask for more, and the jury, why couldn't it decide that wasn't mitigation? Well, that's certainly possible, Your Honor. But what happened with that second contract offer is that Ms. Goldman decided to ---- what happened with that second contract offer is Ms. Goldman claims she verbally accepted it. But she's saying, I verbally accepted that contract offer, so she's using it as a sword and a shield. I accepted it without the ---- without increasing the price. However, I'm using it as a shield because you can't enforce that agreement against me, and that was part of the evidentiary problem that dealt with some of the other issues up on appeal. You didn't try to enforce the agreement against her. I mean, you could have said, okay, fine, sign here. Instead, you asked for another $20,000. Well, part of the $20,000 had to do with carrying costs for the property for a month and a half, and that's part of the reason. But regardless, you can't just say I verbally accepted it. I can't go to court and say, hey, I verbally accept your counteroffer. It would be thrown out because it doesn't satisfy the statute of frauds. So why on the front line ---- But it could be relevant as to mitigation. It would be relevant on mitigation. But what we're talking about is the second ---- the response to the second contract offer, not the second contract offer itself. And we believe that the jury should have had an instruction that said, this second contract offer is under risk to Suenos. And then what Suenos did afterward, and the fact of the matter is ---- This is a question of fact, not of law, right? The second contract offer, we believe, should be a matter of law because no reasonable jury can comment. But the Arizona court is opposite to you. The Arizona law is to the contrary, right? Well, the Arizona generally ---- we certainly concede that mitigation is generally a fact issue, but under the circumstances of this case. What case in Arizona ---- I looked at the Arizona law, and I thought it was a factual issue. Maybe I missed something. What case in Arizona says that this is a question of law? I'm not saying that ---- again, Suenos concedes that this is generally a question of fact. However, when reasonable ---- So then that doesn't end the issue? I don't think it does, because reasonable minds can only come to one conclusion regarding that particular second ---- Oh, so what you're saying is that because he sent it to the jury, that he should be reversed? What I'm saying is because he said that he didn't make a directed finding, that that second contract offer constituted undue risk to Suenos as a matter of law? And what's your closest case from Arizona that I should read so that I can say, yes, you've got a good point? The cases I saw just went the other direction, so that's why I was interested. Well, again, Your Honor, I fall back on the argument that I've been making, that no reasonable juror could find that, notwithstanding the fact that during the trial itself ---- I think you've made that argument three times, but I'm asking for the law of Arizona upon which you base the argument. And my law just deals with general summary judgment standards, Your Honor. All right. I see that I'm running short of time. I would have liked to ---- Save what you can. Okay. Again, model juror ---- If you keep talking, you're not saving what you can. Okay. Thank you. Good morning, judges. May it please the Court, my name is Dax Watson. I'm appearing on behalf of Diane Goldman. I'm in a little bit of a tricky situation because I have to do not only a responsive argument right now, but my cross-appeal argument on motion for summary judgment. I'm sorry, on the attorney's fees issue. So I'm going to be real brief on responding to counsel on their arguments in chief here. I agree with some of the questioning, not saying that the panel agrees with our position, but on this whole idea of whether or not that should have gone to the jury. Of course it should have gone to the jury. I mean, the ultimate issue here is they wanted their cake and to eat it too. They got their cake. They got a ruling early on in the case that said that Diane Goldman breached the rule and she canceled improperly. And then they wanted to eat it too by saying, and the jury effectively doesn't get to consider any of these mitigation issues, and that they didn't ever have to. What was the mitigation? Well, the mitigation was two-fold, Judge. First, she came back and offered a second contract. Which gave her more time. I'm sorry? Which gave her more time. Well, let me. Starting with the contract. She offered a contract that gave her more time. She offered a contract that said, I will go forward with the deal, and she wanted a three-day inspection period. But as you rightfully pointed out, Judge, then there was a significant. So stop right there. I want to take this piece by piece. Because it seems to me at that point, that's sort of a Hobson's choice for the seller. I agree. So that's not going to be enough for mitigation. I agree. Okay. So you got to keep going past that. And that's, I agree. And that is actually their argument. Their argument is that choice. Well, wait a second. If we enter into that, now she's got to get a jail-free card if she cancels within the three days legitimately. Okay. That's a pretty compelling argument. I think it's a great argument. Okay. But then what happens next? They counter the second agreement. They add several terms, including removing the inspection period. What happens next? There is a discussion between a principal of Suenos and Diane Goldman, in which she says, okay, I'll agree to everything in the counter. I just don't want to pay the extra $20,000. And then that's when it all blows up. There are more, it is more than just the contract. There's the counter and then the subsequent discussion where they could have made a decision at that point. All right, for $20,000 we can get this deal done. That is mitigation questions. That is mitigation evidence and the judge's right to let the jury decide that. And as our judge already pointed out, that's the law in Arizona. Mitigation. How much time has passed? I mean, I've forgotten the timeline. It was days, Judge. Okay, so we've just heard back from Suenos that they had additional carrying costs on the property. I understand. Did your client make any offer to cover the carrying costs? She did not. I mean, and that's, again, an issue. But the question is, did the judge in a trial court err in allowing that to go to the jury? And clearly did not. These were factual issues that the jury could have decided. And the jury could have said, you know what, that $20,000, that's carrying costs. That's real money. All right, they didn't fail to mitigate. Was the question raised to the jury, was it covered by jury instruction on the law? The mitigation instruction was given, Your Honor. What was the jury told about undue risk? Judge, I have to throw myself on the sword on that. I don't have that in front of me. I don't think they were told much. And that's probably accurate. But arguments were given. There was also evidence given that it was a sham, which plays right into undue risk. There was a testimony from Suenos about the whole idea of why they were concerned with signing it. That was in front of the jury, Your Honor. And that was presented to the jury. If you don't mind, because my time is short and I have to do the cross-appeal, I want to deal with the attorney's fees issue. As you know, we've appealed the court's ultimate ruling here that, A, Suenos was a prevailing party. And, B, that they were entitled to attorney's fees of roughly a million dollars. We walked through various reasons why. I think number one, we have to look at, did the court, the trial court, apply the right test? In Arizona, there's three tests a court will undertake to determine who the prevailing party is. And that analysis for you is de novo. Did they apply the right test? The three tests are the net judgment rule, which is what was applied here, the totality of the litigation, or the percentage of success. Now, why this is super important is the net judgment rule is pretty simple. They just look and see, was there a claim and a counterclaim or an offset claim? And if who got the net judgment? Well, you're not allowed to apply it in a case when there was no counterclaim or offset claim, which is what the judge did here, which is the error. Well, why do we make the fact that district court both entered judgment for Suenos and awarded Suenos damages in terms of totality of the circumstances? Well, if we go to that test, the totality of the litigation test, Your Honor? Yes. Yeah. Well, when you look at the totality of the litigation, the courts and the case law tells us we have to look at the litigation as a whole, and we don't just look at the judgment. We look at what were they seeking and what were they awarded. Here, let's remember, they were seeking almost a million dollars. That was what was presented to the jury. The jury awarded them $9,000 after they applied the mitigation. So they got less than 1% of what they were seeking. So under a reasonable interpretation of the totality of the litigation, case law in Arizona, that's a no-brainer. I mean, if you ask anybody walking down the street that scenario, somebody asked for a million dollars, got a $9,000, who won? All right. Since your time is running out, let me move to the question of, considering the district court judge did err in saying he could not consider settlement negotiations, would a remand be necessary in this case? I think potentially, well, Judge, our position is, obviously, you should reverse everything and declare us the prevailing party. But I think at a minimum, there's two remands. One is, if you don't agree that you want to go that far and declare us the prevailing party, there needs to be a remand so that the district court actually applies the right test. Again, he applied the net judgment rule, which was not the right test. He needs to apply either the totality of the litigation or the percentage of success analysis. The second remand then also would be that he does have discretion to review and look at settlement offers. And he not only chose not to, he said he could not, and that's just not the law. So at a minimum, both of those should go back for remand.  What do you mean it's not the law? I'm sorry, Judge? What do you mean it's not the law? If you read the opinions and the minute entries from the judge, it was clear that he felt he had no discretion, that under Rule 408, whether it was a federal rule or the state rule, that settlement discussions could never be considered by the district court. And that is simply not the law. The law is clear. The law of what? The law in Arizona and in this circuit, that settlement discussions, why, clearly, they can't be used at trial. Clearly, they cannot be presented to a jury. They absolutely can be considered and should be considered in assessing prevailing party and attorney's fees, because- Is there a rule in the Arizona district court that they have an option to do so, but they don't have to? I believe, and counsel cited it, there's discretion there. There's a Ninth Circuit case, I believe, that says they may consider it. And that's the issue here, Judge, because he didn't even go that far, and that's why the remand would be appropriate. Remember, he sanctioned trial counsel, Tom Nolasco, for even bringing it up in the briefs, because it was the trial court's belief that he couldn't even look at them, and that to even present them was a sanctionable offense. And that is true, that is not the law. Now, ultimately, if you remand it, the decision may be I have discretion whether or not I want to consider it, and he may take that discretion and say I'm not going to, but that is not the position that's before you. This trial court decided we're not even going to look at it, I can't look at it, and I'm going to sanction the attorney that even brought it up to us. So unless there's any other questions, I'd like to reserve the rest of my time for rebuttal. You may. Thank you. You've got nine seconds, we'll give you a minute. Thank you so much, Your Honor. Really briefly, I want to touch on for about 15, 20 seconds, number one, the Hobson's choice is clearly that you discussed, is clearly we believe it is compelling. Sueños didn't have to deal further with Goldman if it believed she breached. We entered evidence of that. We asked for a jury instruction regarding that. That particular jury instruction was not given to the jury. In fact, several jury instructions that literally dovetailed the evidence were not given to the jury. Why do you have to deal with her further? If she comes in and says, okay, I'll do the deal, that's it. Because as a matter of law, I don't have to deal with her further. If she would have submitted that second contract offer and I would have ignored it, I would have been well within my rights and well within all of the case law in the federal circuits. I do want to talk about the mitigation instructions. The mitigation instructions were improper. They just didn't give the jury enough. How can a jury decide undue risk if there's no instruction that allows them to put that hook on? Three points I want to make regarding Ms. Goldman's appeal for fees. The first one, the standard of review for this court is not de novo. It is an abuse of discretion. It is, in fact, Arizona courts, the Melecky case, 214 P3, 415, it's Arizona app, 2009. The medical protective case versus pain, 25 F sub 3, 1232, which is a district of Arizona case, 2014. They say numerous Arizona courts, state and federal, reviewing who is the prevailing party under Arizona law, utilizing any reasonable basis standard of review, the Holbein case, which is what Ms. Goldman relies upon, is actually the Ninth Circuit review of federal statutes. The ADA, section 1988, section 1983, all these Arizona courts, especially the Melecky courts, are very dispositive on this issue. And that really gives the trial court to make the determination, especially in this case, that the net judgment rule was the right rule. And there's been some semantics argument in the briefs regarding what the net judgment rule does. Well, by claiming a mitigation, they're claiming there's a certain amount of damages that Plaintiff isn't entitled to. And Plaintiff is saying, we're entitled to these damages. The fact is the court found that the net judgment rule applied in this case, it cited Ocean West versus Halleck. And the court found that this was the reasonable interpretation to make that, in fact, Ms. Goldman has- I gave you one minute. You're over two. Could you speak to the negotiations issue, the reference to settlement negotiations? Absolutely, Your Honor. This court decided just two years ago in the AD versus California Highway Patrol case that a district court has discretion, one, to consider the amounts discussed in settlement negotiations or not. And two, to give those amounts as much or as little weight as it sees fit. The Arizona rules- But that wasn't the ruling of the district court here, was it? Well, the ruling of the district court was we're not going to consider them. We can't consider that. But even if it does consider them, it doesn't make any difference here. And there's one very important, compelling reason why. There's no evidence in the record that Ms. Goldman ever made a $50,000 offer. And by the time Ms. Goldman made $100,000 or claimed she made a $100,000 offer, we already obtained summary judgment against her and had several hundred thousand dollars in attorney's fees. And then not only that, in November of 2012, we had a settlement conference. And at that settlement conference, we were offered $8,347, which is less than the judgment. Thank you. Thank you, Your Honor. Let me ask one question. I'm sorry. At what point do we get into whether or not this whole harmless provision is enforceable? I believe that's the next. Are we arguing about it now or is it later? I think that's part of the next round. Okay, I'll be patient. Thank you. Okay, thank you, Your Honor. Well, since I'm only addressing my cross appeal, I'll be real brief. We disagree. We believe that the standard for review on what test to be applied, again, there's three tests. Is de novo. We cited those cases. Also, there was a supplemental filing by Suenos just last week where they cited a recent case, the Vortex case. And that is a September 16, 2014 case. And the site is 235 errors, 551. Again, this isn't their supplemental. Have you given that case to us before? I have not. This was something they filed on Thursday of last week as supplemental authority. And the reason I'm bringing it up is when you read that opinion in there, it talks about they're doing a fee award analysis. And they're basing that fee award on a statute. I was just asking whether or not we have that case, and the answer is yes. You do have it. You do. I didn't cite it. I didn't brief it. It's something you received last week. But the point is, in a case that they brought to you, and it was an attorney's fee case, and there was an assessment of prevailing party. The first question before that court was, well, what's the authority to even give attorney fees? And in that case, they were relying on Arizona Revised Statute 1234101. And they said, well, the analysis of we're even going to go down this road, we have to do that de novo, the Court of Appeals said. Once we get beyond deciding whether or not which test or which standard we're going to apply, I agree, we get into an abusive discretion world. But we're not there. You folks, this fine panel, has to decide whether or not our trial court judge used the right test. And then on the mitigation issue, again, with the settlement offers, there was a settlement conference conducted by a federal judge where the first offer of $50,000 was made. At that time, Suenos had $17,000 in attorney's fees. That's absolutely something the trial court should have considered. Thank you. Thank you. Thank both of you for the arguments on this appeal. And now we'll move to the second, the Suenos versus Lawyer's Title. Thank you, Your Honors, and I would like to reserve two minutes for rebuttal, if possible. My name is Patrick Davis, and I'm here on behalf of Lawyer's Title. And to the judge's request, I'll start right off with the release of the earnest money provision, which we claim the court erred in applying the decision, an Arankey decision, to determine that the provision was utterly unenforceable under Arizona law. The judge's decision mischaracterizes the true nature and character of the clause. In Arankey, there was a real estate purchase contract. However, it was prepared by the real estate agents and the real estate association and presented to the buyer and the seller, which the buyer and seller used. And then later, the real estate agents claimed that they were provided immunity from torts based on the form that they had provided to their clients. That's the case. That's not the case here. The case here is that the buyer and seller, Suenos and Goldman, negotiated the contract. It's true they used a form, but they didn't have to use a form. They used a form. They edited it. There were several iterations of it. It's signed. It's initialed on every page. The 30-year attorneys who are Suenos had ample opportunity to delete, amend, or strike. But it was given to you as a done deal. It was given to us as a done deal. This was not your form. It was their form. We had no involvement with the form. I wondered why what happened to the district judge when that argument was made, because it sounds fairly persuasive when we're talking about this. How did the district judge respond to that argument? The district judge claimed that this was, or ruled that this was against public policy because it immunized lawyers' title against tort liability. And even if it didn't do that, there was no evidence of negotiation between Suenos and lawyers' title. Didn't that language at some point emerge from the escrow companies? Company or companies? Well, that was my next point. I mean, just be realistic about this. It appears in a form contract. The language appears to have been extracted from a form contract. And neither of the parties to the contract would have an interest in holding the escrow company harmless, and yet the language appears there. So I can't believe they dreamed it up on their own. Where did it come from? It came from the, that form is prepared by the Real Estate Association of Arizona, generally speaking. And does, they're doing that as a favor to the escrow companies, or is it because they understand that's what the escrow companies provide to take on the responsibilities? Well, Your Honor, I can't speak for the Real Estate Association, and nor is there any evidence to that fact. But it makes sense, because the escrow company doesn't make a penny if the transaction doesn't close. So it's either stuck with a dispute, stuck with the expense of a dispute, stuck with the expense of maintaining the money, or it's granted discretion to simply give it back. And then the parties are deemed able to continue their dispute about the money and continue their dispute about the purchase contract if they so choose. But we also have escrow instructions whereby the parties have agreed in the event of dispute, they'll authorize the escrow company to release earnest money pursuant to the terms and conditions of these instructions in a patched purchase contract. And at the time, it's known that Sueno's disputes Goldman's position and request. And the escrow company gives the money back to Goldman without saying a word to Sueno's. Does that sound like it's an even-handed, well, we're exercising our discretion and we shouldn't be held liable for anything? Well, Your Honor, the decision was made late Friday, and the letters going out to the parties about closing the escrow went out the first thing Monday, according to the- So what's the hurry? I mean, escrow usually holds things. All my experience with escrow is they don't do anything without everybody signing off on it. In this case, they decide to hand the money back to one of the parties. And it's alleged that they had an ulterior motive in doing so, because they had a business relationship that was important to them with the broker for that party. I'm not saying that's how it was, but the jury was free to believe that, wasn't it? No, Your Honor. The court entered judgment prior. This issue was not put to the jury. Okay. The court was able to believe that, and that's not what's being talked about now. Now you're trying to say we've got to get out of jail free provision, even if, in fact, we violated the agreement in giving the money back. That's right, Your Honor, because it grants discretion. It's not a waiver of court liability. It's an amendment to the contract. An escrow officer's obligations are not only set by the escrow instruction, they're limited by the instruction. Your client can be wrong, but the truth has to be more than the client was wrong. I mean, the client was wrong. Yes, Your Honor. And it's a – but, again, this is similar to a disclaimer of warranty. For example, the SRP case, there's a difference between, in the standard, between disclaimers and contract versus disclaimers of court liability. This is a disclaimer of a contract liability, and it was negotiated, it was presented to lawyers' title, it was confirmed in a second writing by a signature by Sweeney. Well, but how is it a disclaimer of contractual liability? Because it says that the escrow company is authorized to release earnest money pursuant to the terms and condition of this contract. So the contract's still there. It's not so you can do anything you want with the money. No, but it says it can reasonably interpret the contract, and if it's wrong, it still – it can't be sued for exercising the discretion granted it, because the parties decided to grant it that discretion. And I apologize, Your Honor, I'm running extremely out of time. I'm happy to continue on this, but I have a couple more issues. But what – I'm following your argument until you get too wrong. I understand you can make a mistake, no problem, no harm, no foul. But there's a point at which you don't get that anymore. What do they have to prove occurred in order to – for your client to be liable for that – the sending back of the $25,000? Well, for example, Your Honor, the discretion is to give it back to either party. But, for example, if we gave it to our brother or converted the funds to a third party, that would obviously be beyond the discretion. It would be an unreasonable exercise of the discretion. Is that the test, unreasonable exercise of discretion? That's what we argue, Your Honor. Beg your pardon? I said that's what we argue. Is that the Arizona law? It's the Arizona law that we've cited. There's no particular case on point. We've cobbled together the argument. But at some point, your mistakes you have to pay for. And if I understand, your argument is they haven't reached that point of showing that we did something that vile or reprehensible. That's right. But you don't – I don't see an Arizona case that I can say, okay, I'll apply the case. No, Your Honor. I believe we – and I apologize. I believe we've recited the statement for that issue on the reasonableness of exercise of discretion. I get the mistake part. I understand that. That isn't hard to understand. But there is some point at which you become liable, and there should be some Arizona law that the district judge relied upon, or did he just pull it out of the hat as to when that occurs, or did he ever get to it? No, Your Honor. He never got to that issue. He applied a ranky, and that was it. And you had the issue before him? Yes. Okay. Are you claiming the Esso Company had no duty at all to Sueno's? No, Your Honor. I'm claiming they had discretion with regard only to the earnest money deposit. There was still escrow liability for escrow negligence. There was still liability with regard to the rest of the $1.5 million contract. This was a very, very discreet discretion granted to lawyer's title, which it exercised. And, Your Honor, I have arguments with regard to the fees, but I only have a minute left. So I guess I'll argue with the fees. Your Honors, it's simple. This Court failed to determine the degree of success or consider the extent of success. This Court in McGinnis ruled some time ago that spending $148,000, no reasonable person would spend $148,000 to get $35,000. In this case, Sueno says they spent nearly $400,000 pursuing a $25,000 compensatory award. The rest of their claims were dismissed. And under Arizona law, I grant the punitive damages, but you can't recover fees for recovering punitive damages. Under Arizona law, it is utterly unreasonable to award fees for prosecuting unsuccessful claims. The original claim was $3.15 million. At trial, the compensatory damages requested were $25,000. The court erred both in the application of law de novo and unreasonably ignored the nature of Arizona law and the nature of the fee request to award Sueno nearly $400,000 against lawyer's title in this case. And that decision should be reversed. Thank you, Your Honor. Thank you. I don't think I need to reserve any time. May it please the Court again, Jonathan Rosen for this time, Plaintiff Appellee Sueno. Lawyer's title's entire appeal is rooted in one single objective, to expand its power as an escrow agent while totally insulating itself from any wrongdoing in which it engages, no matter how egregious. When LTA was el el Well, the escrow agent didn't give the money to her brother. No, it didn't. So no matter how egregious seems to drop out of it. I don't think the word egregious stays respectfully, Your Honor. I think the word egregious is very much the right word. Number one, I want to start at the beginning. These escrow instructions, the ones upon which lawyer's title is relying, they're not even looking at the right provision. You want us to look at section 7? Look at section 7. There's a dispute in the cancellation. Nobody asked for the earnest money. This isn't an earnest money dispute. It never was. The trial court ruled that as a matter of law. In fact, every single LTA witness that got up to the witness stand conceded as much. I don't see any request for the earnest money here. I don't see any request. It wasn't there. So while LTA is requiring on some discretion, and they may have discretion for earnest money disputes, I'm not disputing that, but what I am requiring is that an escrow agent deal strictly with the escrow instructions. That's right here. These are lawyer's title's escrow instructions. They're not mine. My client signed them. My client agreed to be bound by them. But LTA isn't binding itself by its own escrow instructions. I want to touch a little bit on the actual document before you get to the escrow instructions. The purchase agreement? That was, yes. That was, I take it it's given that that was signed by your client, signed by the other side, and was presented to the escrow company as a done deal. Yes. And so pursuant to that agreement, if they make a mistake, they're going to get by, as long as it isn't a very bad mistake? Well, again, the particular purchase agreement doesn't address this particular issue. The purchase contract only deals with earnest money disputes. If you look at the language, and His Honor correctly referred to it, that section 3 of the purchase contract, 3F, and section 14 of the escrow instructions, I can certainly give the Court cites if it would like, the buyer and seller agreed to hold harmless and indemnify the escrow company against any claim, action, or lawsuit of any kind, and from any loss, judgment, or expense, including costs and attorney's fees, arising from or related in any way to the release of the earnest money. The problem is my client's letter didn't demand the earnest money. Every LTA witness that got on the stand was handed this letter and conceded that this letter doesn't say anything about earnest money. In fact, this letter says, hey, you're violating my rights, and this is my — it's not our earnest money, but you can't disperse it at all either. You're supposed to hold the earnest money. My client was telling, Suenos was telling LTA, hey, comply with your own escrow instructions. But LTA didn't do that. And there's a— Roberts, what money was it your client wanted them to hold? The $25,000 earnest money. So it's the earnest money. Yes, Your Honor, but the argument then becomes cyclical. Then what would be the dispute here was over the cancellation, not over the earnest money. Well, the escrow can hold lots of things beyond earnest money. I mean, in the course of the transaction, they may receive the principal payment. So the escrow instructions aren't — I mean, the notion that this has nothing to do with earnest money I have difficulty with, because the fight's over is something that turns out to be the earnest money. But, I mean, I hear your point. There have potentially conflicting instruction — or potentially conflicting sections in the escrow instructions and in the purchase contract. Yes, Your Honor. And at the very least, those instructions get construed against LTA. These are LTA's escrow instructions. My client followed the escrow instructions. It said, hey, don't disperse this earnest money. There's a dispute over the cancellation. Hold it until you get further instructions from the parties or file your own interpleader action, none of which was done. That leads me to another question, which is the money is paid back to Goldman, but you're suing Goldman. You get a judgment against Goldman. How is it there's still something to dispute over the earnest money? Over the $25,000. The disputes are discreet. They're totally discreet disputes. How could that be? You don't have a claim against the title company, except that you may have a valid claim against Goldman to get that money. You don't get that money just because you want that money. What you want the escrow company to do is to hold it for a resolution, but you ultimately got a resolution. You sued Goldman. You got a judgment coming out of that case. If the escrow company had done what you wanted it to, it would be sitting there with $25,000. But why is that money now yours? Well, we told the escrow company that the money wasn't yet ours when we sent them the letter on July 11th. Fine. But why is the money yours today? The money is mine today because there are certain provisions that deal directly with LTA that LTA violated. Yeah, but what they should have done was not give the money to you. They should have held the money. So why isn't returning it to where it should be? Okay, hold the money. But you've now litigated with Goldman. You got a judgment against Goldman. Why is that now your money instead of Goldman's, who paid it in in the first place? Well, because once Goldman gave that earnest money to the title company, it was no longer Goldman's money. No, but what makes it yours? It doesn't make it mine. Okay, fine. So how can you get a judgment against a lawyer's title if you don't have a claim to the money? It didn't make it mine when Ms. I'll be glad to answer that. It didn't make the money mine when Ms. Goldman gave it to them. It didn't make the money necessarily mine when we said hold the earnest money because there's a dispute in the cancellation. Her cancellation isn't proper. I mean, the problem here is that. But why is it yours today? Because LTA violated the very escrow instructions. Uh-uh, uh-uh. That doesn't work. That means they violated, but you haven't been injured $25,000. Your injury is that they're not holding the money. But there's still nothing that I see that should give the money over to your client. But we're entitled to the money that was left in the escrow. That's part of it. Why? Because that's in the contract. That's part of it. Why? You've sued Goldman. You've gotten your judgment against Goldman for whatever injury you suffered as a result of the breach of contract. Okay. Again, the contract itself requires LTA to hold that money. Once LTA wrongfully dispersed that money in violation of its own escrow instruction, that created the damage to me. Fine, but that still doesn't tell me why the money shouldn't still be held today as opposed to paid over to you. Well, LTA canceled the contract. Okay. LTA canceled the escrow. Okay. Well, and you sued Goldman, and you got a judgment against Goldman for breach of contract. Yes. Why doesn't that make you whole? Why do you get this $25,000 besides? Because my claims against LTA are separate from my claims against Goldman. But you still haven't given me a reason for why you get the $25,000. What should have happened is that the lawyer's title would still have the money, and they'd still have the money today. But you don't have a judgment against Goldman that covers that. I mean, you've got a judgment against Goldman that covers whatever your injury, your claim injury, your damage claim against Goldman is. Why does that reach this $25,000? Well, let me take a step back here. Once we heard that they were going to be dispersing the money, we sent, on July 17th of 2008, we sent a cure notice. And we said, hey, listen, the plaintiff, Ms. Goldman, needs to close this contract by the 21st. When she didn't do it, then we demanded the earnest money. The earnest money, we followed what the contract said to do. Well, then Goldman should get a $25,000 credit against her judgment? No, I don't believe so, Your Honor. Okay. I also would like to address some other points. Number one, the ---- This $25,000 didn't disappear. The contract itself says that there's a problem, that the parties are required to go to mediation to decide what to do with the $25,000. It's still sitting there someplace. Have the parties gone to mediation, as the contract suggests? The parties went to mediation after the lawsuit was filed. We certainly agreed to stay. For the $25,000, there was a mediation? No, the mediation was over Ms. Goldman's breach of the contract. So there's been no mediation over the $25,000. It's still sitting someplace. Well, the $25,000 is sitting in Ms. Goldman's bank account because it was dispersed to her. It hasn't been dispersed, has it? Isn't it still sitting in her bank account, the $25,000? I can only assume that when she received the check on July 11, 2008, before 5 p.m., that she took it and put it in her bank. She certainly didn't ---- Well, the escrow instructions specified the parties would go to mediation and resolve any conflict, and I just wondered whether that was done and what turned up in that mediation. But I believe with respect to that mediation, that was disputes between Goldman and Sueños, not involving LTA. The escrow instructions covered disputes with LTA. I did want to address the Court's discussion of the hold harmless provision. If the Court looks at the Arizona Supreme Court ruling in Salt River Project, they will see that, patently, the parties did not bargain for the hold harmless provision. In fact, every ---- Mark Walker, I'll give you a citation of the record. Sueños ER 309, colon, 18 to 20, 341, colon, 10 to 17, and colon, 348, 22 to 349, 3, said that this was a boilerplate form. And boilerplate forms are not acceptable if they're not ---- if they are not negotiated. The last issue I want to address is the attorney's fees. Sueños won everything. And all of the claims here relate to a similar operant set of facts. The tortious interference claim, in fact, the jury ---- the Court found sufficient evidence to go to the jury, and the jury decided ---- I'm sorry, I see that I'm out of time, but ---- Roberts, that is your thought. Thank you, Your Honor. The same operant set of facts applies to Sueños' claims against lawyer's title. There was bad conduct that happened here, egregious conduct that was with an evil mind that warranted the punitive damages.  And LTA violated those rights. In conscious disregard of those rights, and gave that money to Goldman. And by that, I mean, Sueños not only got a $25,000 judgment against LTA, Sueños also got an $85,000 punitive damages award based on all a wealth of evidence that the jury found clearly and convincingly told them that what LTA did was improper and warranted punitive damages. And attorney's fees that were awarded were pursuant to the Arizona statute, and the Court determined clearly that Sueños was the prevailing party, again, based on the same operant set of circumstances. Thank you, Your Honor. Thank you. I'll let him go a minute and a half over, so you can have a minute and a half. Your Honor, unless you have a question, I'll forward my last 20 seconds to a minute and a half. Can I give that to us? We thank you for the generosity. We thank all counsel for your helpful arguments. Both cases are submitted for decision.
judges: Wallace, Nelson, Clifton